# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DONNA RADASZEWSKI, Guardian, on behalf )
of Eric Radaszewski, )
           )
         Plaintiff, )
           )     No. 01 C 9551
      v. )
           )
BARRY S. MARAM, Director of the )     Judge John W. Darrah
Illinois Department of Healthcare and )
Family Services,[1] )
           )
         Defendant. )

## OPINION AND ORDER

Plaintiff, Donna Radaszewski, filed suit, as guardian and on behalf of her son,

Eric Radaszewski ("Eric"), against Defendant, Barry S. Maram, the Director of the Illinois

Department of Healthcare and Family Services ("HFS"), in the Circuit Court of DuPage County,

Illinois. Radaszewski sought, in part, injunctive relief compelling the IDPA to fully fund the cost

of the private-duty nursing care that Eric required in order to remain at home. In December 2000,

the state court entered a temporary injunction requiring the IDPA to restore funding to the

Radaszewski family sufficient to pay for sixteen hours a day of private-duty nursing. That injunction

remains in effect today. Subsequently, the suit was removed to federal court based on the addition

of federal claims in Plaintiff's Supplemental Complaint. The federal claims alleged that HFS

---

[1] The original Complaint was filed against the then-director, Jackie Garner, of the Illinois Department of Public Aid ("IDPA"), now known as the Illinois Department of Healthcare and Family Services.

violated Title II of the American with Disabilities Act of 1990, 42 U.S.C. § 12132, ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, ("RA"), by refusing to provide medical services that Eric requires to remain in the most community-integrated setting to provide for his medical needs – specifically, his home.

In April 2002, the Court remanded Plaintiff's state-law claims to state court and retained jurisdiction over the remaining two federal claims. In October 2002, the Court dismissed Plaintiff's ADA claim, finding that Plaintiff could not sue the Director of HFS in her official capacity in federal court for relief under Title II of the ADA pursuant to *Walker v. Snyder*, 213 F.3d 344 (7th Cir. 2000), and granted judgment on the pleadings in favor of Maram on Plaintiff's RA claim. That decision was appealed to the Seventh Circuit Court of Appeals. In September 2004, the Seventh Circuit reversed and remanded the case, finding that *Bruggeman v. Blagojevich*, 324 F.3d 906, 912-13 (7th Cir. 2003), issued after this Court's decision, recognized that *Walker v. Snyder* had been overruled by the Supreme Court in *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001). Therefore, the allegations in the Supplemental Complaint permitted an inference that Plaintiff could prevail on her RA claim. *Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004) (*Radaszewski*).

Plaintiff's suit alleges that the IDPA's failure to fully fund, at-home, private-duty nursing for Eric constitutes disability discrimination in violation of the ADA and the RA, in that the state is refusing to provide the medical services that Eric requires to remain in the most community-integrated setting appropriate for his needs – his parents' home. The state contends that, under the

2

available state/federal programs, Eric may only receive $4,593 per month – the equivalent of five hours a day of private-duty nursing care – no further reasonable accommodations can be made to increase the amount Eric could receive.

The three factors considered in determining whether a state is obligated to provide community-based treatment for disabled persons are: (1) the state's treatment professionals find that community-based treatment is appropriate; (2) the affected individuals do not oppose community-based treatment; and (3) placement in the community can be reasonably accommodated, taking into account the state's resources and the needs of others with similar disabilities. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-603 (1999) (*Olmstead*); *Radaszewski*, 383 F.3d at 608.

On September 10, 2007, a bench trial commenced on the ADA and RA claims. During the trial, the parties presented exhibits and testimony of witnesses, including expert witnesses.

The parties have submitted post-trial written arguments and proposed findings of fact and conclusions of law. The Court has considered the evidence, including the testimony of the witnesses and exhibits, and has further considered the written arguments of counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity the witness had to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness

3

of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. §§ 1.13, 1.21 (2005). The Court also considered the testimony of expert witnesses in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 through 705.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all of the admissible evidence and this Court's assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The Decision section of this Opinion and Order, for purposes of organization and clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, they shall be so deemed.

## FINDINGS OF FACT

### Eric's Medical Condition and Treatment Requirements

Eric, born in August 1979, was diagnosed in 1992 with medulloblastoma, a brain cancer. In 1993, Eric suffered a mid-brain stroke after undergoing surgery, radiation, and chemotherapy to treat the cancer. The cancer, stroke, and subsequent treatments have impaired Eric's physical and mental functions and left him with multiple and complex disabilities.

4

After several extended hospital stays, Eric resided at his parents' home and received twenty-four-hour care from multiple nurses and therapists. In approximately August 1995, Plaintiff's medical insurance terminated; and Plaintiff contacted HFS regarding receiving nursing services for Eric.

Eric is eligible for, and a participant in, the Illinois Medicaid Program. In Illinois, HFS is the single state agency responsible for administering the Medicaid Program. Illinois receives federal funds for the Medicaid program.

Eric was approved to receive healthcare services until he reached the age of twenty-one (August 2000). HFS provided funding for sixteen hours a day of private-duty nursing in Eric's home under the federally approved Illinois Medicaid Program for Medically Fragile, Technology Dependent Children ("MFTDC program"). This program was approved through an HFS waiver and provides a variety of home and community-based services and equipment for medically fragile persons under the age of twenty-one who would otherwise be required to be cared for in a skilled pediatric facility or hospital. *See* Ill. Admin. Code § 140.645. The MFTDC program's services include private-duty shift nursing and respite care in the recipient's home. The amount of services that an individual may receive under this program is determined with reference to the cost of the care the individual would require in a skilled pediatric facility or hospital. *See* Ill. Admin. Code § 140.645(c)(3).

When Eric obtained the age of twenty-one, the HFS reduced its reimbursement to $4,593 per month – the equivalent of five hours a day of private-duty nursing. Plaintiff filed an administrative appeal because the reduced funds were insufficient to provide the nursing services Eric required. The appeal was denied.

5

In 2000, an HFS hearing officer made factual findings about Eric's eligibility for the Home Services Program ("HSP") and the level of care that Eric required. These findings included the uncontradicted evidence that Eric would be at risk should he be placed in a nursing home because Eric could not receive the required level of care he needs in a nursing home. Specifically, the hearing officer concluded:

> A. Grievant [Eric] is a 20 year-old-man who was diagnosed with a medulloblastoma in 1992. He underwent surgery and chemotherapy for that condition. As a result of that condition and treatment for that condition, he has many physical disabilities and has lost both brain and bodily functions. He has been cared for at home for the past 5 years through funding from the Illinois Division of Specialized Care for Children (DSCC). This care, plus the admirable efforts of his parents, has allowed Grievant to be cared for in his home. Grievant wishes to be maintained in his home with his family; this is also his parents' wishes.
>
> * * *
>
> H. The uncontradicted evidence submitted by Grievant is that the Grievant would be at risk of danger if he should be placed in a nursing home. Grievant's doctor testified that Grievant needs substantial one-on-one nursing care to survive. He is medically fragile, prone to infections, immobilized, catheterized and relies on oxygen. A registered nurse is required to look for problems before they become "full blown and he crashes," according to Grievant's doctor. His immunological responses were severely compromised due to earlier radiation and chemotherapy, so skilled nursing care is a "question of survival, not a question of doing well." The physician strongly urged that Grievant be given the funds to support 24 hours per day of skilled nursing care. Placing Grievant in a nursing home facility of the type suggested by the State, according to the physician, would result in Grievant being seriously medically compromised, which would lead to many hospitalizations.
>
> I. Grievant's physician's opinion was supported by the registered nurse in charge of Grievant's care. He described Grievant's medical needs in detail. Grievant has no sense of thirst, so his hydration must be carefully monitored in order to avoid serious medical complications. Although Grievant has difficulty swallowing, he can be given soft food, but only under careful conditions. His nutrition

must be carefully monitored. Grievant cannot protect his airway by turning his head; any aspiration of food, liquid or medicine can become a medical emergency. Chronic sinus infections lead to sepsis, which can be rapid and acute. Grievant also has osteoporosis and is in danger of breaking bones. His risk of injury is high because he sometimes forgets he cannot walk. His short-term memory is not good and he is often confused. He also has difficulty with urination and elimination, which if left untreated, can result in medical emergencies. Grievant has to be under constant surveillance.

J. According to the expert witness offered by Grievant, Grievant could not get the level of required nursing care in a nursing home facility, including the facility suggested by the State (Alden Lincoln Park Nursing facility). In her assessment for this hearing, the expert contacted several nursing homes (including Alden) and asked about the level of care provided. According to the witness, none would provide the level of care need[ed] by Grievant: 24 hour[s] per day by skilled clinical nurses. She based her assessment on the Grievant's medical file, her observation of Grievant, and her 20 years of experience as a skilled nursing professional.

The Court heard testimony from Doctor Michael Peters, who has been Eric's primary care physician since September 2002. Dr. Peters is a licensed physician, holds several hospital appointments, is a diplomat of the American Board of Family Practice since 1990, and has been a fellow of the American Academy of Family Practice since 2006. Dr. Peters considers Eric to have a very complex medical condition ("Eric is probably the most complex medical case I have had to take care of during my medical career . . . ."). Eric's current medical conditions include the lack of any meaningful pituitary gland function, which makes Eric reliant on several hormonal preparations to maintain normal bodily functions. Eric is completely reliant on outside sources of hormonal support. Eric receives thyroid treatment, adrenal hormone, and a supplemental form of testosterone.

7

Eric is reliant on supplemental forms of nutrition given via hyperalimentation to maintain normal salt balances and chloric intake. He has difficulty absorbing and utilizing things properly by mouth so he requires intravenous administration.

Eric has an active seizure disorder that is treated with two different seizure medications. By virtue of Eric's disease state, Eric has a chronic immune suppressive condition that causes him to be very prone to infections, including pneumonia, urinary tract infections, and soft-tissue infections. These infections oftentimes require that Eric receive very strong antibiotic therapy through home intravenous antibiotic therapy. Eric's hormonal therapies have resulted in deformities of his bones and spinal column. Eric has trouble breathing properly and is prone to aspirating things he eats into his lungs. The spinal deformity is progressive and affects his ability to breathe, especially when he sleeps at night.

Eric is globally developmentally delayed. He communicates on a simple basis, but he cannot communicate how he feels very clearly in most situations. Eric receives between 20 to 25 different medications on a daily basis, and approximately 10 other medications on an as-needed basis for things such as nausea and pain.

In Dr. Peters' opinion, Eric requires private-duty nursing because he requires daily monitoring, vital-sign checks, and proper administration of his medications. This nursing would require a registered-nurse-level nurse who is experienced and knowledgeable and available to actively assess Eric on a daily basis. A nurse with this experience and knowledge would also be able to monitor Eric's condition to watch for interactions and complications from medications and

8

treatments and would be able to identify possible medical conditions early so treatment could be immediately instituted. Dr. Peters' opined that Eric's survival since the onset of his medical conditions is directly related to receiving private-duty nursing.

Dr. Peters does not believe that Eric could be properly treated in a nursing home because the number of patients that a nurse at a nursing home has to supervise and care for during the day would not allow the nurse adequate time to care for Eric. Furthermore. much of the daily care of patients in a nursing home is delegated to assistants. Dr. Peters' "concerns" with Eric's being in a nursing home include the risk that Eric would not appropriately receive treatments, resulting in infections due to Eric's decreased immune system, and the regularity of infections occurring in nursing homes, which would result in Eric's likely succumbing to repeated infections and would result in repeated hospitalizations. Dr. Peters testified:

> I believe the severe nature of his disabilities, the constellation of problems that he has, quite frankly, I don't think he would get the care he would need. In fact, it would create more problems for him putting him in a nursing home setting. I truly believe he would not do well in that setting.

Eric's medical condition at the time of trial was essentially the same as it was in August of 2000.

Ms. Radaszewski, Eric's mother, testified that Eric requires one-on-one nursing services to be cared for at home. Eric has no short-term or long-term memory so he is not aware of what he is doing much of the time. Eric has a ventriculoperitoneal shunt, a catheter placed in his brain for drainage to keep pressure in Eric's brain under control. Eric is wheelchair-bound and cannot effectively walk. He uses a platform walker with belts to be moved short distances, such as five steps to get to a chair or toilet. He also needs someone to watch for seizures, hydrocephalus, and shunt malfunctions. He has a skin condition that creates half-dollar-size sores of blood and pus.

9

These sores appear without warning and must be dressed to keep Eric safe from infection. Eric also has a double-lumen "PIC" line. This intravenous line is used to administer drugs and to feed Eric at night, at which time he receives an eight-hour IV solution of total parental nutrition ("TPN"). Eric needs assistance with eating because he aspires and chokes.

The services that Eric receives are from registered nurses because they have the experience and knowledge required for Eric's care. Eric's typical day starts anywhere from 7:00 a.m. to 11:00 a.m. when he gets up. A nurse either gives Eric a bath or shower after taking down Eric's TPN line, flushing the IV lines, and administering all of the IV medications for the morning. The nurse also separates Eric's pills that are taken throughout the day.

At the time of trial, Eric was receiving sixteen hours of private-duty nursing per day and 336 hours of respite hours per year pursuant to the injunction entered previously by the state court. Eric's parents provide Eric's care during the remaining eight hours a day. During this time, Eric usually takes a nap; and his parents provide him his medications. The medications are "pre-prepared" for Eric's parents, and written instructions are provided. His parents also watch for fevers and seizures, take him out to eat, and take him outside of the home on other occasions. In the event of any unusual symptoms, Eric's parents, as instructed, contact medical professionals. Eric has equipment in the home to aid in lifting him, and his father generally assists in lifting Eric. Eric's parents (his mother was 59 years old, and his father was 60 years old at the time of trial) have difficulties in providing care for Eric due to their age and their own medical conditions.

At home, Eric watches videos and likes to put things together. He likes to paint, color and draw. A nearby friend that has cerebral palsy comes to the home and plays with Eric. Eric also enjoys going to the movies, shopping, and going to restaurants.

10

The state's treatment professionals have found that community-based treatment is appropriate; and the affected individuals, Eric's guardians and Eric, do not oppose community-based treatment[2]. If institutionalized, Eric would require the equivalent of the private-duty nursing care that he has received at home. A hospital setting would provide the equivalent care to the care Eric receives at home with monitoring devices, telemetry, and the increased nursing staffing available in hospitals.

The cost of Eric's care in a hospital would exceed the cost of his care in the community, including both the sixteen hours per day of skilled nursing he receives at home and any ancillary medical costs. For example, in its last cost estimate preceding Eric's twenty-first birthday, the state estimated the institutional cost of Eric's care to be $29,330.40 per month, while the cost of his care plan at home – including sixteen hours of nursing services per day, supplies, equipment, and other therapies – was $20,868.19 per month. The cost of Eric's care in 2005 (the most recent year with complete data) was $20,499 per month or $676.53 per day. The average Medicaid reimbursement for hospital stays longer than 120 days for persons twenty years old or older was $1,428 per day for July 1, 2004 through October 28, 2005. Hospital reimbursement rates have not decreased since that time.

## Illinois Healthcare Programs and Services

Frank Kopel is the chief of the Bureau of Program and Reimbursement Analysis ("BPRA") of HFS. One of the units or functions of the BPRA is the policy unit that oversees the state Medicaid plan. The state Medicaid plan is a contract between the State of Illinois and the federal government,

---

[2]As pointed out by the Seventh Circuit, the first two conditions – the propriety of community-based care for Eric and the consent of Eric and his affected family members – are undisputed. *See Radaszewski*, 383 F.3d at 608.

controlling the operation of the Medicaid program by the State of Illinois. The federal government requires each state to designate a single agency to be responsible for the Medicaid program in the state; in Illinois, that agency is HFS. A "waiver" is a provision by which the federal government allows the state to provide services that are not otherwise covered under the state Medicaid plan.

Medical providers in the Medicaid program are individuals or institutions that have agreed to provide services in compliance with the Medicaid state plan, to accept certain reimbursement as payment in full, and to abide by all of the rules and regulations of the state and federal Medicaid programs. The federal government reviews and approves the state Medicaid plan and provides approximately 50 percent of the funding for Medicaid. The amount of funds provided by the federal government is known as the federal financial participation ("FFP").

The state plan lists services and the amount of reimbursement for those services that are covered under the state plan. The state plan also lists eligibility for these services. Per the federal government, certain services must be provided; these are mandatory coverage services. Other services are provided but are optional services.

Early periodic screening, diagnosis and treatment services ("EPSDT") is a mandatory program for individuals under the age of twenty-one. Under this program, the state must provide any service that is listed in Section 1905(a) of the Social Security Act that is medically necessary to individuals under the age of twenty-one. These mandatory services are provided irregardless of whether they are available to the rest of the population. Private-duty nursing is an example of a service provided for under EPSDT that is not included in the State of Illinois Medicaid plan.

Private-duty nursing is one-on-one care provided to a person who has that medical need. Once an individual reaches the age of twenty-one, services otherwise provided under EPSDT are no longer available because that individual is no longer eligible for those services based on that individual's age.

The HSP is a program designed to assist individuals with severe disabilities to remain in their home and receive services instead of residing in a nursing facility. The HSP is authorized by the persons-with-disabilities waiver. The BPRA financially monitors the HSP by reviewing claims to enable securing matching federal funds and by reviewing the cost allocation plan of HFS to see that the portion of their costs that are attributable to Medicaid are reasonable and that they are adequately documented.

The HSP is a very cost-effective program. In 2005, HFS reported that there were 19,827 participants in the HSP waiver and that the cost per participant for care in the community was $19,140 per year, while the estimated cost for care in the institutional setting was $32,816 per participant per year, a savings of $13,676 per participant per year.

For a claim to qualify for matching funds, it must: (1) be a covered service under the state plan or a waiver, (2) be provided to a Medicaid-enrolled and eligible individual, and (3) be provided by an enrolled provider.

As to hospital coverage under the Medicaid plan, there is no limitation on the number of days an individual can stay per year in a hospital. There are no facilities that are owned and operated by the state, specifically for long-term care of persons with disabilities.

13

Hospitals are reimbursed on a diagnosis-related grouping ("DRG"). The entire range of diagnoses are grouped into groups or classes of care that have similar resource utilization. When a claim comes in, a diagnosis and related procedures are analyzed with a computer program; and they are classified into one of these groupings. The price is then based upon the classification grouping for the services. In other words, there is an expected duration of stay based on the diagnosis code; and the hospital is reimbursed on that basis. The reimbursement is a "flat" reimbursement, unrelated to the actual length of stay; whether it is one or more days, the reimbursement is based upon the statistical computation. The hospital can get additional payment other than what was otherwise given under the DRG if the individual requires care longer than what would have been expected under the DRG. Long-term hospital stays are reimbursed on a per diem basis.

Barbara Ginder is the bureau chief of the Bureau of Interagency Coordination ("BIC") for HFS. The BIC is the liaison with other agencies that have day-to-day operation responsibilities of home and community-based waivers and other medical programs. This included waivers for HFS services, including a home and community-based waiver for a persons-with-disabilities waiver and a MFTDC's waiver. Both of these programs seek to provide services in the community that are appropriate for the person at no greater cost to the department than it would be if the person was in an institution. If HFS did not comply with the requirements of a waiver, the waiver could be terminated; and the state would lose the federal matching funds for the services provided under that waiver.

14

"Comparability" refers to the requirement that if a service is offered under the state plan, it has to be offered in the same way to anybody that has that medical need. Under a person with disabilities waiver, comparability can be designed individually so that certain limits can be imposed on certain services or be designed for certain kinds of disability groups or ages or medical conditions.

The federal government requires that all home and community-based waivers have cost neutrality – HFS cannot spend more money than would be spent for that same individual in an institutional setting. HFS measures cost neutrality on an average – across all participants in the program. In other words, HFS compares the projected waiver costs for all people in the waiver with the expected cost of the same population in a nursing home. However, the state can choose whether it wants to require every person to show that their cost is less than the cost of the alternate care in the institution or to let some individuals be above that cost and some below the cost, as long as the aggregate is cost-neutral. Under the person with disabilities waiver, the level of care comparison and institutional cost limit is that of a nursing facility.

Service cost maximums are cost caps based on the individual's determination-of-need score. The determination-of-need score is calculated based on what kind of impairment the individual has and what kind of support is needed. The determination-of-need scores range from 29 to 100. As the determination-of-need score rises, so does the cost cap.

If an individual is approved for a waiver and chooses the waiver of services over a nursing home, the individual and a case manager develop a service plan. The service plan outlines the kinds of services the individual needs, including the type and frequency of services, as well as who would provide such services. The service plan must be approved by the individual's physician.

15

An individual's written plan of care is a service plan that is created with the consumer's choice in mind with the assistance of a case manager and other providers as needed to develop the most comprehensive plan of care to maintain this individual in the community setting. The concept of consumer direction for a person with disabilities waiver allows the individual to hire, train and fire their own staff and allows an individual to put together a service package that best meets his needs and helps him become as independent as possible and have the quality of life that he requires.

Skilled nursing services are available to individuals under the person with disabilities waiver. There is no limitation on the number of hours per day that an individual in the HSP can have in terms of skilled nursing in their home other than a fixed-cost cap that is assigned to that individual. Accordingly, eight or more hours of skilled nursing in the home could be approved for an individual.

An exceptional care rate is a rate developed in the long-term care system for individuals who have exceptional or extraordinary medical needs. The long-term care system developed as a way to move individuals out of a hospital-based care to nursing homes. Exceptional care rates are utilized in the HSP and function the same as the service cost maximums, providing the upper limit of cost that the individual can seek for services per month.

The state has flexibility to meet the needs of persons who have problems of medical complexity. Effective January 1, 2007, the exceptional care rates that previously were applied to reimburse nursing homes to care for persons falling within categories of exceptional care needs were terminated when the Illinois Medicaid Program converted its nursing home reimbursement rates to a new reimbursement scheme. However, HFS continues to apply exceptional care rates to some HSP participants, even though such exceptional care rates are not in fact current nursing home rates and are fictional rates. Illinois law authorizes exceptional care rates up to the amount of a hospital rate.

Thomas R. Napolski is a vocational rehabilitation counselor for HFS. Previously, Napolski was a case counselor for the HSP. As a case counselor for the HSP, Napolski assessed individuals to identify if they were eligible for the HSP and to find appropriate types of services that would serve the disabled individual's needs. Napolski was Eric's case counselor. Eric was referred for the HSP on October 4, 1999. Eric was found to be eligible for the HSP in August 2000 and received services for the month of August 2000. Eric's case is now in "interrupt" status so he is not receiving services under the HSP. Eric continues to receive funds pursuant to the injunction that the state court entered in December 2000.

HFS can submit amendments to a waiver to the federal government for approval. All of the requests for amendments to waivers HFS filed as to waivers in the last ten years have been approved by the federal government.

## Reasonableness of the Proposed Accommodation

Todd Menenberg, the Managing Director at Navigant Consulting ("Navigant"), is an economic analyst and rendered several opinions for the Defendant as an expert. Navigant is a leading firm nationally working with Medicaid, including Medicaid waiver issues. Menenberg opined that if all 26,000 individuals then in the HSP asked for and received an increase in the amount of services that they received up to the service cost maximum, the total annual cost of the program would be $206,000,000. If the 26,000 individuals asked for and received an increase in the amount services equal to that Eric seeks (250 percent), the total annual cost of the program would be $472,000,000. Menenberg's opinion in this regard is based, in part, on the premise that if Eric

17

was allowed to receive additional funds (essentially removing his service cost plan), all of the 26,000 individuals would also request and be permitted to avoid their service cost plan and receive funds up to the service cost maximum.

Based on a study conducted by Menenberg, at the time of trial there were approximately 9,000 Illinois Medicaid residents under the age of sixty that resided in nursing facilities. Menenberg also opined that approximately 12 percent of these 9,000 individuals would live at home if they could receive all of their nursing care at home. Menenberg estimates that the annual cost to the state, if these individuals received such care at home instead of in a nursing facility, would be $32 to $33 million annually.

Menenberg further opined that if the service plans were removed as a restrictive device and if individuals under a waiver or in a nursing home could avail themselves of a waiver and receive as much as they believed they needed, the total estimated annual cost for the first year would be between $238 million to $505 million.

Samuel Flint, Ph.D., an assistant professor of public policy at Indiana University Northwest, testified on behalf of Eric. He opined that Menenberg's conclusions were based on unsupported assumptions and resulted in unreliable conclusions. Dr. Flint pointed out that Meneberg assumed that all participants would seek additional services up to the maximum amount allowed and would receive such additional services without regard to the existing utilization review process that requires a medical need for services. Also, Menenberg's analysis, with respect to the nursing home population, failed to apply proper statistical standards, such as an actuarial analysis. In addition, Dr. Flint noted that Menenberg used non-random judgmental sampling in determining the possible

18

increased costs based on individuals', presently in nursing homes, moving to community care. Non-random judgmental sampling could not be used to reliably extrapolate the possible increased costs for in-home nursing. Furthermore, the assessments of the costs associated with the sample individuals' moving to community care failed to take into consideration other relevant factors, such as participation by family members in community, in-home care of the disabled person.

Dr. Flint also disagreed with Menenberg's conclusion that if Eric received the requested community-based treatment, precedent would dramatically affect the cost to the state for care of current nursing facility residents and for persons with disabilities waivers because the state Medicaid Program has ways to accommodate very ill individuals, such as Eric – for example, exceptional care rates. Dr Flint opined that if Eric received the needed funds, increasing the cap on funds he could receive, only 864 other people could seek an increase in their funding. If these 864 individuals received an increase of 10 percent, the increased cost to the state would be $152,000. If these 864 individuals received a 30 percent increase, the increased cost to the state would be $456,000. In Dr. Flint's opinion, only 143 other individuals would move from a skilled nursing facility to community-based treatment, as compared to Menenberg's estimation of 1,100 individuals' moving to community-based treatment and the estimate of Matthew Werner (another defense expert discussed below) of over 5,700 individuals' moving into community-based treatment.

Dr. Flint's opinions were based on sufficient facts and reliable principles and methodology. Dr. Flint further applied the principles and methods reliably to the facts. Dr. Flint's expert testimony was credible and persuasive.

Menenberg's analysis and testimony was not based upon reliable principles and methodology and was not credible or persuasive. Menenberg's opinions consist of calculations without supporting rationale as to his methodology and its application to other purported individuals similar to Eric. His calculations are based, in part, on the unsubstantiated premise that if Eric is permitted to exceed the cost cap imposed for his care plan, then all 26,000 participants in the HSP would also request and be entitled to receive services up to their service cost maximum, or 10 percent, 20 percent or 250 percent of their service cost maximums. Menenberg does not attempt to identify any persons participating in the HSP who require the amount and types of services that Eric requires. Rather, Menenberg's methodology consists of taking the number of the HSP recipients and calculating the benefits they are receiving now and the maximum benefits they could receive, whether or not those HSP participants need additional care or services. Menenberg fails to provide an explanation as to his assumption that utilization review would essentially be eliminated and that individuals will automatically avail themselves to services if they are offered at no cost.

With respect to Menenberg's projection that the state will incur $32 to $33 million in additional costs for individuals presently in nursing homes who may want to return to the community if Eric prevails, Menenberg fails to identify persons presently in nursing homes whose needs are not being met at the nursing home level of care and are comparable to Eric (whose needs cannot be met at a nursing home level of care).

Furthermore, Meneberg's methodology in estimating these costs by sampling 28 of 216 cases to arrive at an estimate for the entire census of approximately 9,000 persons with respect to nursing home residents was flawed because Menenberg, as mentioned above, used non-random judgmental sampling and lacked reliability because his methodology was a census, not a sample of the

20

population. Menenberg could not identify who selected the 28 persons in the sampling. The sole person who assessed those individual cases, an HFS nurse, used only the Minimum Data Sets ("MDS") of the 28 individuals and did not take into account other relevant factors, such as the care available to those persons at home, in making her assessments.

Matthew Werner, the former advisor to HFS on healthcare finance and former Chief of HFS's Bureau of Rate Development and Analysis, also offered "expert" testimony for the defense. He opined that if Eric received twenty-four hours of skilled nursing care in his home the additional cost to the state for persons residing in nursing home facilities and receiving twenty-four hours of skilled nursing and persons participating in the HSP receiving the same reimbursement as Eric could be $2.2. to $3.3 billion annually. However, Werner's methodology was not based on any projections of the number of persons who would leave nursing facilities because of a decision favorable to Eric nor the actual cost of services to the state as a result thereof. Instead, Werner estimated the potential *maximum* impact. Werner did not know how many individuals would shift to community services and did not know how many individuals would qualify for the same type of services Eric receives. Werner did not use standard actuarial methodology, which would have statistically determined the estimate of expected cost based on expected utilization, not the maximum possible cost.

Importantly, Werner's analysis failed to take into account medical necessity and assumed that a judgment in Eric's favor would essentially obviate medical necessity and the utilization review. Werner could not specify as to how many persons would qualify to receive Eric's level of services, how many individuals would shift from a nursing home to home care, nor could he testify as to

Eric's medical condition or needs and how those conditions compared to the needs of persons presently in nursing homes or in the HSP. Werner's analysis and testimony were not based upon reliable principles and methodology and were not credible or persuasive.

## CONCLUSIONS OF LAW

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" is defined as one who "with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). A "public entity" includes "any State or local government" and "any department, agency, special purpose district or other instrumentality of a State . . . or local government." 42 U.S.C. § 12131(1)(A), (B).

Pursuant to Title II, the Attorney General has promulgated regulations, providing that "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450. Although a public entity must make modifications as "are reasonable" in order to avoid unduly segregating the disabled, the public entity does not need to make such modification if it can show "that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

22

The RA, which applies to programs receiving federal funds, includes a similar anti-discrimination provision, 29 U.S.C. § 794(a), and corresponding regulation, requiring that a recipient of federal funding administer its programs and activities "in the most integrated setting appropriate to the needs of qualified handicapped persons," 28 C.F.R. § 41.51(d). Also consistent with the ADA, the RA's integration mandate provides that a recipient of federal funding need not accommodate a disabled person when the proposed accommodation would impose an "undue hardship" on the recipient. 28 U.S.C. §§ 41.53, 42.511(c); 45 C.F.R. § 84.12(c).

The relevant provisions of the ADA and the RA and their implementing regulations are construed in the same manner. *See Radaszewski*, 383 F.3d at 607.

"[U]njustified institutional isolation" of a disabled individual receiving medical care from a state institution constitutes an actionable form of discrimination under Title II. *Olmstead*, 527 U.S. at 597-603. Institutional placement of individuals who can benefit from community-based settings perpetuate "unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life"; and institutional confinement "severely diminishes the everyday life activities of individuals, including family relations, social contacts . . . and cultural enrichment." *Olmstead*, 527 U.S. at 600-01. Thus, a state may violate Title II if it refuses to provide an existing benefit to a disabled individual that would enable that person to live in a more community-integrated setting. *See Radaszewski*, 383 F.3d at 609; *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1182-84 (10th Cir. 2003); *Townsend v. Quasim*, 328 F.3d 511, 516-20 (9th Cir. 2003).

23

A state is obligated to provide community-based treatment for disabled persons if: (1) the state's treatment professionals find that community-based treatment is appropriate; (2) the affected individuals do not oppose community-based treatment; and (3) placement in the community can be reasonably accommodated, taking into account the state's resources and the needs of others with similar disabilities. *See Olmstead*, 527 U.S. at 607; *Radaszewski*, 383 F.3d at 608.

Under the fundamental-alteration defense, the public entity may demonstrate that it should not be required to accommodate the disabled individual by showing that adapting existing institutional-based services to a community-based setting would impose unreasonable burdens or fundamentally alter the nature of its programs and services. *See Olmstead*, 527 U.S. at 603-06; *Radaszewski*, 383 F.3d at 611, 614.

## DECISION

Based on the foregoing, Plaintiff has sufficiently stated and proved a claim under the ADA and RA. *See Olmstead*, 527 U.S. at 597-603; *Radaszewski*, 383 F.3d at 609. Defendant argues that neither the ADA nor RA provide for an independent claim for integration in the community and that the authorities cited by Plaintiff do not recognize an independent claim for integration. Defendant's arguments are meritless and directly contrary to *Olmstead* and *Radaszewski*. *See Olmstead*, 527 U.S. at 597-603; *Radaszewski*, 383 F.3d at 608 ("In view of the integration mandate, the [*Olmstead*] Court agreed . . . that a State is obliged to provide community-based treatment for individuals with disabilities . . . ."). Defendant also argues that the Seventh Circuit's decision in this case, *Radaszewski*, 383 F.3d 599, is "of no aid" to the Plaintiff because it does not constitute a decision

24

on the merits. However, while the Seventh Circuit's ruling is not "a decision on the merits," it still constitutes controlling case law and must be followed by this Court where applicable. *See United States v. Krilich*, 178 F.3d 859, 861 (7th Cir. 1999); *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994).

Eric is a qualified individual with a disability under the ADA and the RA. HFS is a public entity under the ADA and the RA. Eric and his parents do not oppose community-based treatment and specifically seek to allow Eric to remain at home and receive the same level of care he has been receiving for the last several years.

Eric has severe, long-term disabilities. Eric is eligible to receive services through the Illinois Medicaid Program. Eric is at risk of being placed in an institutional setting, and Eric is qualified to receive services through the HSP. Community-based treatment is an existing benefit under the Illinois Medicaid Program and is appropriate for Eric.

Eric's medical condition requires he receive the equivalent of the private-duty nursing care he presently receives at home. If Eric was placed in an institution, he would require the equivalent of the private-duty nursing care he presently receives at home but still would not receive the level of necessary treatment and health care if so placed. Rather, a hospital setting would be necessary to provide Eric with the proper treatment and care that he requires. Providing Eric sixteen hours per day of skilled nursing care in his home and ancillary costs associated with this health care costs less than the cost of Eric's health care if he was placed in a hospital.

If Eric was required to be placed in an institution, Illinois would be required to provide Eric the necessary level of health care – constant monitoring and continuous skilled assistance in accomplishing basic bodily functions. The services that Eric requires and presently receives at home

25

are, in substance, the services that would be required in a hospital. The unrebutted evidence clearly shows that the cost of caring for Eric in the proper institutional setting – a hospital – would be substantially greater than the cost of allowing Eric to remain in the community and receive the same proper treatment and health care. Allowing Eric to remain in the community can be readily accommodated, taking into account Illinois' resources and the needs of others with similar disabilities. Illinois can approve an HSP plan for Eric that exceeds the nursing home rate. If otherwise necessary, Illinois could also modify or alter the waiver from the federal government, which encourages the states to use home and community-based waivers to meet the community integration contemplated by *Olmstead*. Illinois could act in cooperation with the federal government to achieve community-based integration which may otherwise be impeded by existing rules or requirements. Thus, there is no need to adapt existing institutional-based services to a community-based setting that would impose unreasonable burdens or fundamentally alter the nature of Illinois' services and programs.

Illinois has not demonstrated that providing the requested accommodation to Eric would impose an unreasonable burden on the state or fundamentally alter the nature of its programs and services. The evidence offered by the state, including the flawed "expert" testimony of Menenberg and Werner, has not shown that Eric's healthcare needs cannot be reasonably accommodated by community placement considering the state's resources and the needs of others similarly disabled.

## CONCLUSION

For the foregoing reasons, judgment is entered in Plaintiff's favor and against Defendant on

Plaintiff's ADA and RA claims. The parties are ordered to meet, confer, and submit a proposed

order, setting forth the appropriate relief, consistent with the holding of this Opinion and Order, on

or before April 18, 2008.

Dated: March 26, 2008

JOHN W. DARRAH
United States District Court Judge